**Betty LEVIN et al., Plaintiffs,**

v.

**MISSISSIPPI RIVER CORPORATION et al., Defendants.**

**No. 67 Civil 5095.**

United States District Court,
S. D. New York.

June 26, 1974.

Orans, Elsen & Polstein, New York City, for plaintiff Betty Levin; Sheldon H. Elsen, John Lowenthal, New York City, of counsel.

Pomerantz Levy Haudek & Block, New York City, for plaintiff Robert LeVasseur; Abraham L. Pomerantz, William E. Haudek; New York City, of counsel.

Donovan, Leisure, Newton & Irvine, New York City, for plaintiff Alleghany Corp.; John E. Tobin, M. Lauck Walton, Glenn S. Koppel, New York City, of counsel.

Dewey, Ballantine, Bushby, Palmer & Wood, New York City, for defendant Mississippi River Corp.; Everett I. Wil-

lis, Robert S. Wolf, Gerald E. Ross, New York City, of counsel.

Sullivan & Cromwell, New York City, for defendants Missouri Pacific Railroad Co., Robert H. Craft, T. C. Davis and Thomas F. Milbank; David W. Peck, Michael M. Maney, Carroll E. Neesemann, Marcia B. Paul, New York City, of counsel.

Greenbaum Wolf & Ernst, New York City, for objectors Edward Garfield and Barbara M. Garfield; Edward Garfield, New York City, of counsel.

Michael Paul Cohen, Chicago, Ill., William Heimowitz, New York City, for objectors Jacob R. Cohen and June Cohen.

John Charles Viani, Point Pleasant, N. J., Winchester F. Ingersoll, Jr., Cambridge, Mass., William R. Wesson, Mantoloking, N. J., objectors pro se.

## OPINION

EDWARD WEINFELD, District Judge.

This is the final stage in the settlement of these consolidated class actions; hopefully, the closing chapter in the controversy and litigations in which the Class A and Class B shareholders of the Missouri Pacific Railroad Company ("MoPac") have been embroiled for almost two decades. Familiarity is assumed with this court's opinion approving the terms of the settlement,[1] as well as with the related litigation which established the voting rights of the Class B stock.[2] The notices sent to stockholders of the hearing upon terms of the proposed settlement also set forth the applications by attorneys for allowances and that their consideration would be deferred until after entry of final judgment. The settlement pursuant to the final judgment has been fully consummated. The matter now before the

1. Levin v. Mississippi River Corp., 59 F.R.D. 353 (S.D.N.Y.), aff'd on opinion below sub nom. Wesson v. Mississippi River Corp., 486 F.2d 1398 (2d Cir.), cert. denied, 414 U.S. 1112, 94 S.Ct. 843, 38 L.Ed.2d 739 (1973).

2. Slayton v. Missouri Pac. R. R., 233 F.Supp. 747 (E.D.Mo.1964), rev'd sub nom. Mississippi River Fuel Corp. v. Slayton, 359 F.2d 106 (8th Cir. 1966), rev'd sub nom. Levin v. Mississippi River Fuel Corp., 386 U.S. 162, 87 S.Ct. 927, 17 L.Ed.2d 834 (1967).

928

court is the application of plaintiff Alleghany Corporation for reimbursement of fees paid by it for legal, expert and consultant services; also, the application of attorneys for plaintiffs Levin and LeVasseur for allowances for their services, plus disbursements. Under the terms of the settlement the allowances awarded by the court are to be paid equally by defendants Mississippi River Corporation ("Mississippi") and MoPac.

The notice to stockholders stated that Alleghany's request for reimbursement in the sum of $850,000 would not be opposed by MoPac and Mississippi; it also stated that the Levin-LeVasseur, attorneys' application for an allowance in the sum of $6,953,000 would be opposed by MoPac and Mississippi. After the affirmance of the judgment authorizing the settlement and following approval by the stockholders and by the Interstate Commerce Commission, the interested parties, in a desire to avoid litigation on the fee issue, reached an agreement whereby the Levin and LeVasseur attorneys limited their application for fees to $2,000,000, plus disbursements of $22,422.06, which Mississippi and MoPac would not oppose.

■ Upon the return date of the hearing of these applications, five shareholders objected to the payment of the fees as requested, but generally their views reflected continuing objection to the settlement. Two of them, owners of Class A stock, opposed payment of fees by MoPac on the ground that only the Class B stockholders or other allied interests should be assessed the costs of the litigation. The court finds that the objections raised are without substance. The settlement, as this court noted in approving it, was of substantial value to the B stockholders; it was also of substantial value to the corporation and necessarily all its stockholders in ending the costly litigation which, had it gone to trial, whatever its outcome, would not have ended the strife between the two classes, with continuing diversion of MoPac's officers from their essential duties in operating the railroad and advancing its other economic interests. MoPac's commitment to pay one-half the allowed fees may be considered an additional cash payment to the Class B shareholders as part of the settlement, so that what they received is on a net basis. Accordingly, the sole issue that remains is what is a fair and reasonable allowance for the services by the respective applicants.

The general factors to be considered in awarding fees in litigation of this type have recently been specified by our Court of Appeals in City of Detroit v. Grinnell Corp.,[3] and need not be enumerated in detail. Although that was an antitrust suit, the same general standards may be applied. While they serve as guides, no precise or mathematical formula is mandated; what is required is that, giving due consideration to all relevant and significant factors, the court award a sum that is fair and reasonable—one that is neither excessive nor inadequate.[4]

A preliminary word is in order. The applicants, in stressing the value of their services in terms of benefit to the Class B shareholders, refer to the $850–16 share package of new common stock for each share of old Class B stock as a conversion rate of $2,450, reflecting a gross settlement of $97,340,950 for all 39,731 shares of the old Class B stock. Thus, Alleghany, applying the $2,450 per Class B share exchange factor, notes that the average highest annual bid price for Class B shares for the period from 1965 to 1971, following the Supreme Court's ruling in the voting rights case, was approximately $1,778. Based upon the 39,731 Class B shares outstanding on December 31, 1971, Alleghany argues that this amounts to an aggregate increase in the value of the Class B stock of at least $26,699,232, and stresses that its requested allowance

3. 495 F.2d 448 (Mar. 13, 1974); see Lindy Bros. Builders v. American R. & S. San. Corp., 487 F.2d 161 (3d Cir. 1973).

4. Cf. Alpine Pharmacy, Inc. v. Chas. Pfizer & Co., 481 F.2d 1045 (2d Cir. 1973).

of $850,000 is about 3% of the aggregate increase in the value of the Class B stock. The Levin-LeVasseur attorneys, using the same exchange factor of $2,450, take the market value of the Class B stock after the Eighth Circuit Court of Appeals ruling (rejecting class voting rights) and just prior to the Supreme Court's granting of certiorari, $530 per share, and compute the net benefit to the Class B shareholders at $76,283,520. This conceptual theory of benefit somewhat overstates the matter. The Class B shareholders received for their shares what the court deemed a fair and reasonable equivalent on a compromise basis to put an end to continuing controversy between them and the Class A stockholders—a settlement that offered "a permanent solution to the longstanding impasse." [5] This was no recovery of a cash fund or securities which gave the shareholders something of value they did not already own. They were exchanging stock already in hand for other stock of a different class plus cash on a basis deemed to be fair and reasonable in the light of the respective rights of the two groups of litigants, the strength and weaknesses of their respective positions, the probabilities of ultimate success upon a trial, and an evaluation of the terms of the settlement compared with the likely benefits in the event of success upon a trial. However, rejecting the applicants' theory in no respect diminishes the value of their services in achieving a favorable settlement with its consequent and anticipated benefits to the corporation and its stockholders. On the basis of the sixteen shares received by the Class B stockholders, their annual dividends at $5 per share will be $80 instead of the $5 previously declared; also the marketability of the common shares is improved and the settlement is net to each shareholder. Other benefits are set forth in the court's opinion approving the settlement. Indeed, the simple fact is that the settlement achieved more for the Class B stockholders than if they had been successful in the litigation, since it at once removed the root cause of their continuing controversy, whereas even success in litigation would not have brought about that result.

The principal thrust of the plaintiffs' claims was directed toward MoPac's restricted dividend policy and the relief sought included the declaration of additional dividends in prior years and increased dividend distribution in the future. The issues raised by the defense required not only legal services of a high order, but the advice and assistance of certified public accountants, investment analysts and railroad economists. The pretrial discovery and preparation for trial involved the study of the complex history of MoPac's reorganization, including analysis of the various ICC opinions relating to the several proposed plans, the voting rights litigation, and relevant accounting principles, and evaluation of volumes of corporate financial data of defendants' and other railroads.

The discovery process, of necessity, was extensive. It encompassed not only depositions of witnesses, but the preparation of meaningful interrogatories and exhaustive inspection and investigation of defendants' files in an effort to obtain documentary support for plaintiffs' contentions, including the allegations of conspiratorial conduct to withhold dividends in order to depress the price of the Class B stock. The importance of dredging up meaningful information to establish the plaintiffs' claims necessarily required the services of senior rather than associate attorneys in the deposition discovery process. The negotiations leading to the settlement, which at times appeared impossible of achievement, were prolonged and were consummated only on the eve of trial when the attorneys were fully prepared, on the basis of their pretrial activities, to proceed to trial. After the settlement was reached, the attorneys expended considerable time in meeting objections to its approval, and after its approval, in seeking to up-

---

5. Levin v. Mississippi River Corp., 59 F.R.D. 353, 373 (S.D.N.Y.1973).

hold it in the Court of Appeals and before the ICC, and also thereafter in effectuating its terms.

## ALLEGHANY'S APPLICATION

■ This action was commenced by plaintiff Levin in December 1967. Alleghany intervened by leave of court, as did plaintiff LeVasseur. The action was ordered to be maintained as a class action on behalf of all Class B stockholders. Alleghany was the largest Class B stockholder, owning 53%. This majority position obviously made it more than an average litigant in the protection of its interests. Alleghany's attorneys were Donovan, Leisure, Newton & Irvine, and in all, their fees and expenses and those for the services of other law firms, accountants and financial experts, totalled $850,000 for which Alleghany seeks reimbursement.

Alleghany's attorneys expended a total of 14,312½ hours in the prosecution and settlement of the action, which included those of senior partners and associates billed at rates charged by that firm and others of similar standing, and totalling $680,234.68. Upon the hearing a senior partner testified that since the onset of the litigations the attorneys had agreed to bill Alleghany at the rate of $65 per hour for partners' time and $40 per hour for associates' time, averaging $47.50 per hour.[6] The attorneys' disbursements amounted to $59,712.20, or a grand total for Alleghany's attorneys' fees and expenses of $739,946.88, most of which Alleghany has already paid and has agreed to pay the balance. In addition, to assist in the prosecution and settlement of the action, the attorneys retained the services of other law firms, a certified public accountant, and management, transportation and economic consultants, whose charges they certified as

fair and reasonable, and which totalled $110,053.12, which Alleghany has paid. Thus, the total paid or owed by Alleghany for all services is $850,000.

The sum requested, measured by any applicable standard—whether the benefits conferred upon the class, the importance of the litigation to the public, the complexity, magnitude and difficulty of the case, the hours expended by lawyers, their status and standing at the bar or the rates charged—is fair and reasonable, if not on the modest side. Alleghany's application for reimbursement in the sum of $850,000 is granted.

## APPLICATION OF ATTORNEYS FOR LEVIN AND LeVASSEUR

Plaintiffs Levin and LeVasseur were substantial owners of Class B stock. Plaintiff Alleghany, as the majority owner of the Class B stock, had a veto power over corporate action that required the separate approval of the Class B stock; accordingly, independent representation of the minority Class B group was fully justified. In addition to the principal class action claims with respect to MoPac dividend policy, the Levin-LeVasseur group asserted derivative claims on behalf of MoPac. Orans, Elsen & Polstein represented plaintiff Levin, and Pomerantz, Levy, Haudek & Block represented plaintiff LeVasseur, but they cooperated and their application is a joint one.[7]

■ While in some measure the activities of the Levin-LeVasseur attorneys and Alleghany's ran a parallel course, in other respects it did not; in any event, the attorneys acted independently in espousing the interests of the Class B minority group.[8] They also represented minority Class B interests in the Missouri action which determined the voting rights of the Class B stock-

---

**6.** At the hearing objectants were afforded an opportunity to cross-examine the attorneys who testified as to their services.

**7.** The application also includes services of other counsel engaged in this and related litigation, which are set forth in the affidavits in support of the requested allowances.

Counsel have agreed among themselves as to the allocation of any award, so it is not necessary for the court to make a specific allocation.

**8.** *See* Levin v. Mississippi River Corp., 59 F.R.D. 353, 367 (S.D.N.Y.1973).

holders. The attorneys request an allowance of $2,000,000, reduced from their original request of $6,953,000, as noted above, and $22,422.06 for disbursements. These applicants urge that since MoPac and Mississippi are obligated to pay any fee award, their agreement not to oppose the reduced application, particularly in view of their opposition to the originally requested amount, affords strong assurance of its reasonableness and accordingly should be given great, if not decisive, weight. However, to accept as conclusive the parties' agreement as to fees in a class or derivative action would mean the surrender of the court's duty and its discretion. The agreement, while it may have some relevance, does not relieve the court of its duty to make an independent appraisal, to "avoid awarding 'windfall fees' and . . . likewise avoid every appearance of having done so," and to award only such fees that are fair, "with an eye to moderation" [9] based upon the applicable standards.

The award is sought for services rendered over a ten-year period in this and the related predecessor actions wherein the voting rights of the Class B stock were defined.[10] The effectiveness and skill of the attorneys who espoused the interests of the Class B stockholders are attested to by the settlement itself. They are of considerable experience in class and derivative stockholder litigation, and their expertise was brought to bear in the instant case on behalf of their clients. Because of the magnitude, complexity and importance of the issues, the lawyers who participated in the various aspects of the litigation in the main were senior attorneys. They were opposed by eminent and able attorneys representing the defendants. The pretrial procedures were conducted with conspicuous ability and were of signal importance in achieving the settlement. The services of the Levin-LeVasseur attorneys were rendered on a wholly contingent basis and, unlike the Alleghany attorneys, no payment to date has been made to any of them. The total time expended by these attorneys, principally the seniors, was 11,083¼ hours. However, this is but one factor, and in this court's view only of relative importance in the instant case.

Upon the hearing of these applications the court questioned whether the portion of the time and the services rendered in the voting rights action which reached the Supreme Court were compensable in this action. After reflection I am satisfied that they are, since the right of the Class B stock to vote separately was the basis and hard core of this litigation. Indeed, the settlement of this action could only have been achieved because of the successful conclusion of the voting rights suits.[11] The effective veto power of the Class B stock obviously was a principal factor in bringing about the settlement. The fact that the attorneys' applications for fees in the Missouri action were not allowed does not foreclose granting allowances for such services. The Eighth Circuit Court of Appeals, which reversed the district court ruling which did grant them fees, acknowledged "[i]t is undisputed that the Class B stockholders obtained a very substantial benefit from the litigation they instituted and won," [12] but noted that "the right of the named plaintiffs and their attorneys to make a pro rata recovery of

---

9. City of Detroit v. Grinnell Corp., 495 F.2d 448, at 469–470 (2d Cir., 1974).

10. Slayton v. Missouri Pac. R.R., 233 F. Supp. 747 (E.D.Mo.1964), rev'd sub nom. Mississippi River Fuel Corp. v. Slayton, 359 F.2d 106 (8th Cir. 1966), rev'd sub nom. Levin v. Mississippi River Fuel Corp., 386

U.S. 162, 87 S.Ct. 927, 17 L.Ed.2d 834 (1967).

11. *Cf.* Angoff v. Goldfine, 270 F.2d 185 (1st Cir. 1959).

12. Missouri Pac. R.R. v. Slayton, 407 F.2d 1078, 1081 (8th Cir.), cert. denied, 395 U.S. 937, 89 S.Ct. 1998, 23 L.Ed.2d 451 (1969).

fees and expenses against the Class B stockholders . . . is not directly before us in this case," [13] and finally that any benefit to MoPac was only incidental to the main litigation which did not create a new fund for the corporation or the preservation of assets so as to warrant an allowance. Thus the request for special services is proper in this action, which may be considered a companion or related one.

It is at once apparent that these attorneys, on the basis of less hours than those expended by Alleghany's attorneys, are seeking a substantially higher allowance. The services of that firm in achieving the settlement were of equal value to those of the Levin-Le-Vasseur group. However, as was pointed out at the hearing, and as is the fact, Alleghany's attorneys had a paying client; they received and would receive payment from their client no matter what the outcome of the litigation. These attorneys, however, faced the prospect of no compensation for almost ten years of extensive and conspicuous services if they did not prevail in this action. The success of the suit, with its thrust directed toward the dividend policy, which centered on the business judgment of directors, obviously could not be foretold—as this court suggested, at best the probability of ultimate success upon a trial could only be one of "cautious prophecy." [14] Taking into account the difficult and complex problems inherent in the litigations, the total results achieved for the class, the benefit to MoPac, the skill and experience of the attorneys, the hours expended by senior and associate attorneys at prevailing rates, the high caliber of opposing counsel, the risk of no compensation or recovery of expenses in the event of nonrecovery, the court deems $1,750,000 as fair and reasonable. These counsel are also entitled to reimbursement for disbursements in the sum of $22,422.06.

Judgment may be entered accordingly.

13. *Id.* at 1082.

14. Levin v. Mississippi River Corp., 59 F.R. D. 353, 366 (S.D.N.Y.1973).